**Dated: December 12, 2019**

**The following is ORDERED:**



Sarah A Hall
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| GINA MARIE MILNER, | ) | Case No. 19-11539-SAH |
| | ) | Chapter 7 |
| Debtor. | ) | |

**ORDER ON MOTION FOR REVIEW OF ATTORNEY'S COMPENSATION PURSUANT TO SECTION 329 AND CONDUCT AS A "DEBT RELIEF AGENCY" UNDER SECTION 526 AND NOTICE OF OPPORTUNITY FOR HEARING [DOC. 15]**

On October 2, 2019, the following matters came on for hearing before the Court:

1. Motion for Review of Attorney's Compensation Pursuant to Section 329 and Conduct as a "Debt Relief Agency" under Section 526 and Notice of Opportunity for Hearing [Doc. 15], filed by the United States Trustee (the "UST") on August 2, 2019 (the "Motion"); and

2. Corrected Objection to Motion for Review at Docket No. 15 and Brief in Opposition [Doc. 24], filed by B. David Sisson, Esq. ("Sisson") on August 21, 2019 (the "Objection").

The UST appeared by and through Charles Snyder; Sisson appeared by and through Daniel E. Garrison, who is a principal in Fresh Start, a financing and collection management service for attorneys (defined below). After the hearing, the Court directed the UST and Sisson to file

written closing arguments on or before November 4, 2019. The UST filed its closing argument on November 4, 2019 [Doc. 35], and Sisson filed his closing argument on November 4, 2019 [Doc. 36].

## BACKGROUND

In this matter, the UST asks the Court to review the compensation received or to be received by Sisson from the chapter 7 consumer debtor pursuant to 11 U.S.C. § 329 and his conduct as a debt relief agency pursuant to 11 U.S.C. § 526.[1] Sisson has been a bankruptcy practitioner in the Western District of Oklahoma since 1992 -1993, handling over 2,500 consumer cases in that time. He is board certified and a member of a variety of bankruptcy related organizations. The Court is very familiar with Sisson and his work history as a bankruptcy practitioner.

The Court is also well aware of the desperate need of individual consumer debtors to obtain the advice and assistance of qualified counsel in filing for chapter 7 or 13 relief, but such advice and assistance is often beyond their means due to their unfortunate financial circumstances. Judge Kevin Anderson of the United States Bankruptcy Court for the District of Utah provides a thorough summary and analysis of the hardships facing consumer debtors in finding and retaining counsel to file their chapter 7 cases. In re Hazlett, 2019 WL 1567751 (Bankr. D. Utah 2019). The hurdles are, in large part, created by the Bankruptcy Code itself which debtors' counsel have tried to work around with little success:

> In an effort to work around the conundrum of providing consumer debtors with competent legal representation while offering an

[1]Unless otherwise indicated, hereafter all references to sections are to the Bankruptcy Code, Title 11 of the United States Code.

> affordable payment system, debtors' counsel have employed a number of processes with unsatisfactory results. These include debtors issuing post-dated checks, paying legal fees with a credit card, withdrawing funds from a retirement plan, or taking out a home equity loan. Each of these options can be problematic for the attorney and ill-advised for the debtor.
>
> This outcome is ironic given that the Bankruptcy Code and Rules governing attorney's fees, coupled with the applicable ethical canons, are intended to protect debtors. Yet, these high-minded requirements and restrictions often result in greater prejudice to debtors who do not receive a discharge (or worse are denied a discharge under § 727) simply because they are too poor to pay a retainer up front to procure the needed legal representation.

Hazlett, 2019 WL 1567751, *6. While the policy and social issues are certainly compelling, this Court's role is to focus on the specific facts and applicable law in the case before it, and not to render a decision based on policy, which is instead within Congress' purview.

## FACTS

### Sisson's Fees for Bankruptcy Services

1. Sisson testified that he usually requires a flat fee of $1,800.00 (exclusive of filing fees) to be pre-paid by a debtor prior to filing the bankruptcy petition. (Sisson testimony). Sisson's flat fees include the cost of credit counseling and the financial management course, a credit report and postage. (Sisson testimony). His services routinely exclude "[r]epresentation of the debtor in any dischargeability actions, judicial lien avoidance, reaffirmation agreements, relief from stay actions or any other adversary proceeding or contested matters." (UST Ex. 3, p. 12 and Ex. 6).

2. The Court questioned Sisson about a $1,500.00 flat fee which it found to be prevalent in his chapter 7 consumer cases. Per Sisson, the $1,500.00 flat fee is a discounted rate only

offered to people who can pre-pay and provide all of the necessary documentation within 30 days. Debtors who pay on a "lay-away" basis and provide documents in piece-meal fashion are not eligible for this rate. Sisson claims 25% of his cases fall within the $1,500.00 retainer model. (Sisson testimony).

3. The Court reviewed all of the individual chapter 7 cases filed by Sisson from January 1, 2019 to April 30, 2019 (the month this case was filed and the three preceding months), of which the Court can take judicial notice.[2] An analysis of those case filings reveals the following regarding the flat fee rates charged by Sisson:

| Flat Fee Paid to Sisson | Number of Cases | Percentage of Cases |
|---|---|---|
| $1,200.00 | 1 | 2.6% |
| $1,500.00 | 31 | 79.5% |
| $1,800.00 | 2 | 5.1% |
| $2,700.00 | 4 | 10.2% |
| $2,835.00 | 1 | 2.6% |

Based on the four-month sample during the relevant time period, Sisson received a flat $1,500.00 for the bulk of his individual chapter 7 cases, ***contrary to Sisson's testimony at the hearing***.

4. Additionally, the $1,500.00 flat fee was offered and used in three cases (7.7% of such cases) where the bankruptcy filing was a "bare bones" filing without schedules, statement of financial affairs, and the like. In contrast, in the two cases where a $1,800.00 flat rate

[2]It is well established that a court may take judicial notice of its own records as well as records of other courts, particularly in closely related cases. Hutchinson v. Hahn, 402 F. App'x. 391, 394-395 (10th Cir. 2010) (citing St. Louis Baptist Temple, Inc. v. FDIC, 605 F.2d 1169, 1172 (10th Cir. 1979)); Cornforth v. Fidelity Inv., 2017 WL 650132 (W.D. Okla. 2017).

was charged by Sisson (100%), the bankruptcy petition was not "bare bones" but included the schedules, statement of financial affairs, and other related documents.

**The Bifurcated Contract Model**

5. In an effort to be able to provide assistance to consumer debtors financially unable to pay his up-front retainer and the bankruptcy filing fee, Sisson turned to the use of bifurcated contracts – one contract for pre-petition services executed pre-petition and one contract for post-petition services executed post-petition. He claims the practice of using bifurcated contracts was used only as a last resort, designed to address debtor emergencies. (Sisson testimony).

6. Sisson offers the bifurcated contract model to those clients that cannot raise the funds necessary to pay his fees up front and need bankruptcy relief immediately as they generally have waited too long to seek legal help. This model requires the payment of additional fees but allows the fees to be paid over time while exposing Sisson to a risk of non-payment; it also offers a solution to clients who otherwise could not afford to engage counsel and pay their fees immediately or over-time but in full pre-petition. (Sisson testimony).

7. Under the bifurcated contract model, after the bankruptcy petition is filed, a debtor can either (i) proceed *pro se*, (ii) hire a different lawyer or law firm, or (iii) enter into a post-petition contract with Sisson to complete the bankruptcy case at a cost of an additional $2,400.00 payable $200.00 per month for 12 months. (Sisson testimony; UST Ex. 8, ¶ 4). Per Sisson, he does not charge interest on the attorney fees due post-petition. (Sisson testimony).

**Sisson and Fresh Start**

8. In July 2018, Sisson entered into a Line of Credit and Accounts Receivable Management Agreement (the "Line of Credit Agreement ") pursuant to which Fresh Start Funding, Inc. ("Fresh Start") would extend a $100,000.00 line of credit to Sisson ("Line of Credit"). (Sisson testimony; UST Ex. 7).

9. Pursuant to the Line of Credit Agreement, when one of Sisson's clients needs to use the bifurcated contract model, he submits the executed post-petition contract to Fresh Start for approval to be included in the Line of Credit.[3] If approved, the client will pay the monthly installment of Sisson's fees under the post-petition contract to Fresh Start. This procedure allows Sisson to immediately have access to the funds rather than wait for the monthly collections to be paid by the client. (Sisson testimony; UST Ex. 7). However, Sisson only receives 60% of the amount paid under any post-petition contract, with 15% held back to create a reserve if a client fails to pay Fresh Start on a Sisson receivable. (Sisson testimony; UST Ex. 7, ¶¶ 2, 2.1 and 2.2).

10. For its administrative functions under the Line of Credit Agreement, Fresh Start receives a fee equal to 25% of the funds administered. (Sisson testimony; UST Ex. 7).

11. Fresh Start has no role in how Sisson's debtors' cases are administered. (Sisson testimony).

---

[3]Sisson studied the bifurcated contract model and the case law addressing it, including notably Hazlett, 2019 WL 1567751, and conducted due diligence regarding Fresh Start and the bifurcated contract model and its disclosure templates, and concluded it was legal and ethical. (Sisson testimony).

12. Fresh Start will report a debtor's payments and defaults to the credit reporting agencies, if a debtor consents to such reporting. (Sisson testimony; UST Ex. 7, ¶ 6.3).

13. The Line of Credit Agreement provides that Fresh Start may pursue any and all rights to collect assigned accounts receivable. (UST Ex. 7, ¶ 5.4).

14. Under the Line of Credit Agreement, Fresh Start's first action in the event of non-payment by a debtor is the loss reserve, then it will look to Sisson and then to the debtor (but Sisson testified he would make Fresh Start whole before it looked to the debtor). (Sisson testimony). However, the Line of Agreement does not dictate this progression. (UST Ex. 7).

15. The Line of Credit Agreement also offers a defense guaranty and indemnity, which are features Sisson considered important in entering into the relationship with Fresh Start. (Sisson testimony).

16. Per Sisson, the bifurcated contract model and the Fresh Start Line of Credit Agreement are about the debtor/client's needs. (Sisson testimony).

17. Sisson only submits bifurcated contracts to Fresh Start. Even though some of his clients cannot pay the up-front fees in 30 days to obtain the purportedly discounted $1,500.00 flat rate, the contracts with those clients who take time to pay the $1,800.00 pre-petition flat fee in full are not submitted to Fresh Start. (Sisson testimony, p. 44).

18. Sisson unsuccessfully attempted to explain why he needed the Line of Credit offered by Fresh Start. However, since Sisson remains liable for unpaid fees, and very few of his

cases use a bifurcated contract model,[4] his explanation fell on deaf ears. (Sisson testimony).

**Debtor**

19. Debtor is a low wage earner, working in a prison cafeteria. (Sisson testimony). Debtor is also a single mother, raising 2 sons (ages 3 and 8) and 2 nieces (ages 10 and 11). (Sisson testimony; UST Ex. 4, p. 24).

20. At the time of her bankruptcy filing, Debtor had gross monthly wage income of $2,170.00 and net monthly wage income of $1,757.62. She also received $304.00 per month in SNAP benefits, giving her a combined monthly net income of $2,061.62. (UST Ex. 4, pp. 22-23).

21. Based on her number of dependents, Debtor's income places her below the poverty level. (Sisson testimony).

22. Debtor's monthly expenses, which in general do not include any otherwise "dischargeable" monthly expenses, exceed her monthly income by $994.24 per month. (UST Ex. 4, pp. 22 - 25). Her expenses include a $200.00 monthly payment to Fresh Start.

---

[4]Sisson estimated that 90 - 95% of his chapter 7 consumer debtor clients pay his attorney fees in full pre-petition. As of November 15, 2019, Sisson had filed 111 chapter 7 cases – so, based on Sisson's estimate, between 5 - 11 of such cases would be expected to fall within the bifurcated contract model offered by Sisson.

23. Debtor "crashed into" Sisson's office on April 16, 2019, very distressed and "virtually hysterical" over an imminent wage garnishment that she could not survive. Sisson adjusted his schedule to accommodate Debtor's emergency.[5] (Sisson testimony).

24. Under Oklahoma law, the maximum amount that can be garnished from a debtor's wages and compensation is generally 25%. Okla. Stat. tit. 12, §1171.1. Sisson could not recall if he considered filing for an undue hardship exemption in the garnishment proceeding, claiming Debtor just wanted to file bankruptcy. (Sisson testimony). Sisson did not suggest Legal Aid or a less expensive attorney[6] as alternatives. (Sisson testimony).

25. Garnishment is not an unusual reason for filing a bankruptcy case. (Sisson testimony).

26. Debtor could not afford to pay Sisson's typical flat rate fee[7] prior to filing the chapter 7 case (between $1,500.00 - $1,800.00). (Sisson testimony).

27. Sisson cannot recall if he offered Debtor the $1,500.00 discounted flat rate but it was his regular practice to do so. (Sisson testimony).

---

[5]At the hearing, Sisson presented "invoices," which his office maintained to track time spent and legal services provided, but not to send to a client (the "Billing Statements"). The Billing Statements indicate that only his legal assistant (his wife) was present during the initial consultation with Debtor on April 16, 2019. (Sisson Ex. 4). Sisson testified that he came into that consultation after his legal assistant had been with Debtor for an hour, but that he failed to record a time entry. Such explanation seemed both convenient and contrived, and could have been clarified by his legal assistant's testimony; however, she was not offered as a witness.

[6]Per Sisson, the average retainer paid for filing a consumer bankruptcy case in the Oklahoma City area is $1,200.00 to $1,400.00.

[7]Sisson testified the applicable rate would be $1,800.00. (Sisson testimony).

**The Bifurcated Contract Model and Debtor**

28. As a last resort, Sisson offered Debtor the bifurcated contract model, i.e., one contract for pre-petition services and another contract for post-petition services. Thereunder, Debtor and Sisson would enter into an engagement contract prior to the filing of her bankruptcy case to prepare a "bare bones" bankruptcy filing, and Debtor would pay Sisson the following pre-petition:

$335.00 Filing Fee

$300.00 Attorney Fee

(Sisson testimony).

29. Sisson analyzed Debtor's income and expenses and knew, at a minimum, she would be running a $500.00 deficit per month and possibly a $900.00 deficit per month. (Sisson testimony, p. 125-126).

30. While Sisson discouraged using bifurcated contracts generally, he could not recall if he told Debtor she could not afford the post-petition $200.00 monthly payment under the bifurcated contract model. (Sisson testimony, p. 127).

31. Sisson informed Debtor it was more expensive to enter into the bifurcated contracts than paying all of his fees up-front. However, Debtor felt "she had to do" the bifurcated contracts as she could not afford to pre-pay his entire fee, had no time to accumulate money, and had no prospect of raising the money. (Sisson testimony).

32. Sisson believed that the bifurcated contract model and higher retainer, including the new debt it created, was in Debtor's best interest. (Sisson testimony).

33. Sisson does not recall if he discussed Fresh Start's ability to pursue collection activities against Debtor under the Line of Credit Agreement. (Sisson testimony).

34. Sisson's oral disclosures to Debtor did not include that failure to enter into the Post-Petition Contract (defined below) would result in Sisson filing a motion to withdraw from her bankruptcy case. (Sisson testimony).

35. At some point during the consultation on April 16, 2019, Sisson or his legal assistant gave Debtor both an unsigned pre-petition contract and an unsigned post-petition contract for his services. (UST Ex. 8 and 9). Debtor was also provided with a recurring payment authorization and consent form respecting Sisson's Fresh Start Line of Credit and Fresh Start's management and collection of her account receivable under the post-petition contract (the "Fresh Start Consent"). (UST Ex. 10).

36. Sisson believed it was better for Debtor to incur a $2,400.00 post-petition debt than allow a garnishment to take effect as the garnishment would be approximately $500.00 per month rather than only $200.00 per month. (Sisson testimony).

**<u>Debtor's Bankruptcy Case</u>**

37. Debtor purportedly returned to Sisson's office on April 17, 2019, with minimal documents, a list of creditors, and a signed, pre-petition contract (the "Pre-Petition Contract").[8] (UST Ex. 8).

38. The Pre-Petition Contract contains an express representation by Debtor that "even if my expenses exceed my income as shown in the bankruptcy statements and schedules,

[8]Curiously, the Billing Statements contain no time entries for any meeting with Debtor on April 17, 2019, the date she allegedly signed the Pre-Petition Contract.

I believe that I am able to make the [post-petition] payments contemplated by this agreement." (UST Ex. 8, ¶ 4).

39. The Pre-Petition Contract includes a waiver of any conflict of interest between Debtor and Sisson. (UST Ex. 8, ¶ 5).

40. The Pre-Petition Contract acknowledges that "executing the post-petition agreement may not be in [Debtor's] best interest." (UST Ex. 8, ¶ 5).

41. The Pre-Petition Contract specifically provides that Sisson is not representing Debtor with respect to such contract and advises her to seek independent legal counsel to review it. (UST Ex. 8, ¶ 10). Sisson admitted it was highly unlikely that Debtor could hire independent counsel to review the Pre-Petition Contract. (Sisson testimony).

42. Debtor allegedly signed the emergency petition and the Pre-Petition Contract on April 17, 2019. Sisson filed Debtor's chapter 7 bankruptcy case late that same day (the "Petition Date"). (UST Ex. 3).

43. Sisson also filed the Disclosure of Compensation of Attorney for Debtor(s), Form 2030 (the "Initial Attorney Disclosure"). (UST Ex. 3, pp. 12-13). The Initial Disclosure provides as to attorney fees:

| | |
|---|---|
| Sisson agreed to accept (including filing fee) | $3,035.00 |
| Paid to Sisson pre-petition | ( 635.00) |
| Balance Due | $2,400.00 |

The source of the compensation paid and to be paid to Sisson was Debtor, and Sisson had not agreed to share his compensation with any other person. (UST Ex. 3, p. 12).

44. The Initial Disclosure further discloses the Fresh Start Line of Credit requiring assignment of Debtor's account to Fresh Start and allowing Debtor to make payments up to 12 months post-petition. (UST Ex. 3, p. 12).

45. The Initial Disclosure, ***filed on the Petition Date,*** also discloses use of the bifurcated contract model, specifically stating ***"Debtor and [Sisson] have entered into two separate fee agreements."*** The Initial Disclosure speaks in past-tense with respect to the post-petition agreement: "The second fee agreement ***was for $2400 signed post-petition*** for the completion of the schedules, representation at the 341 meeting of creditors, and other legal services outlined in the fee agreement. Counsel is able to draw funds under its Line of Credit in an amount up to 75% of the post-petition fees so long as it assigns the post-petition receivable to [Fresh Start]," and then Fresh Start will manage and collect the account. (UST Ex. 3, p. 12).

46. According to Sisson, Debtor returned to his office on April 18, 2019, and signed the post-petition contract (the "Post-Petition Contract").[9] (Sisson testimony; UST Ex. 9).

47. The Post-Petition Contract contains many of the same provisions contained in the Pre-Petition Contract. Those include an express representation by Debtor that she is able to make the payments contemplated by such agreement even if her expenses exceed her income as set forth in her bankruptcy schedules. (UST Ex. 9, ¶ 1).

48. The Post-Petition Contract includes a waiver of any conflict of interest between Debtor and Sisson. (UST Ex. 9, ¶ 2).

---

[9] Again, the Billing Statements contain no time entry for any meeting with Debtor on April 18, 2019, the day after the Petition Date when Debtor allegedly executed the Post-Petition Contract. (UST Ex. 4, pp. 1 - 2). Sisson testified it was an oversight on his part.

49. The Post-Petition Contract acknowledges that "executing the post-petition agreement may not be in [Debtor's] best interest." (UST Ex. 9, ¶ 2).

50. The Post-Petition Contract specifically provides that Sisson is not representing Debtor with respect to such contract and advises her to seek independent legal counsel to review it. (UST Ex. 9, ¶ 6).

51. Sisson testified that Debtor signed the Fresh Start Consent on April 18, 2019. The Court notes that the Fresh Start Consent is dated on April 17, 2019, rather than April 18, 2019. The Court also notes that such date is in the same handwriting as the dates next to Debtor's name on the Pre-Petition and Post-Petition Contracts, that those dates do not appear to be in Debtor's handwriting, and further that the dates next to Sisson's name on the Pre-Petition and Post-Petition Contracts are in the same handwriting.[10]

52. The Fresh Start Consent authorizes Fresh Start to debit Debtor's debit card for $200.00 per month starting on May 20, 2019, until $2,400.00 has been paid in full. Notably, the very fine print beneath Debtor's signature on the Fresh Start Consent also provides that if

[10]Sisson claims that the April 17, 2019 date on the Fresh Start Consent was a mistake and should have been April 18, 2019. The Court is inclined to discount Sisson's testimony on this point. The dates next to Debtor's name on the Pre-Petition and Post-Petition Contracts and the Fresh Start Consent are in the same handwriting, which does not appear to be Debtor's. The dates next to Sisson's name on the Pre-Petition and Post-Petition Contracts are in the same handwriting as the dates next to Debtor's signatures. These facts, when coupled with (i) the absence of any time entry on the Billing Statements for April 17, 2019, the Petition Date, or April 18, 2019, the day after the Petition Date, regarding a meeting with Debtor to sign the documents, (ii) the Initial Disclosure filed on the Petition Date discussing both contracts as having already been entered into, and (iii) the inconvenience and burden of requiring Debtor to return to Sisson's office three days in a row, undeniably intimate that all documents were signed at the same time on April 16 or 17, 2019, and the Post-Petition Contract fictionally dated on April 18, 2019. Debtor could have clarified this had she been called by Sisson to testify, but she was not.

a payment does not process for any reason, Sisson or Fresh Start may process the payment multiple times until such payment clears and that an additional $25.00 may be charged each time payment does not clear. Further, it also prohibits Debtor from disputing the transactions or cancelling the payment authorization unless Debtor disputes the amount of fees owed to Sisson. (UST Ex. 10).

53. The Fresh Start Consent includes Debtor's consent to be contacted directly by Fresh Start for collection purposes and acknowledgment that Fresh Start may report on-time payments and late payments to credit bureaus. (UST Ex. 10).

54. Both the Post-Petition Contract and the Fresh Start Consent were sent to Fresh Start. (Sisson testimony).

55. Under the Fresh Start Line of Credit Agreement and the Post-Petition Contract, Sisson is to receive 75% of the $2,400.00 ($1,800.00) to be paid by Debtor, in addition to the $300.00 paid by Debtor under the Pre-Petition Contract, for a total attorney fee of $2,100.00 to Sisson. Fresh Start is to receive $600.00 of the $2,400.00 to be paid by Debtor under the Post-Petition Contract. (Sisson testimony; UST Ex. 7, 8, and 9).

56. After Debtor's bankruptcy case was filed, Sisson immediately and successfully stopped the garnishment proceeding and obtained a refund check of $360.93. (Sisson Ex. 2 and 3).

57. Sisson then turned to completing Debtor's schedules, statement of financial affairs, and the like. While generally cooperative, Debtor provided written responses to a questionnaire and provided supporting documentation to Sisson on a piece meal basis. (Sisson testimony).

58. On April 22, 2019, based on the language of the Initial Disclosure that the Pre-Petition Contract and the Post-Petition Contract had been entered into prior to the Petition Date, the UST requested Sisson provide copies of the two contracts and the Fresh Start Line of Credit Agreement. (UST Ex. 5A and 5B; Sisson testimony). Sisson promptly provided the Pre-Petition and Post-Petition Contracts and the Line of Credit Agreement to the UST. (UST Ex. 5A and 5B).

59. Sisson concluded the Initial Disclosure did not adequately explain the bifurcated contracts entered into with Debtor or the Fresh Start Line of Credit. (Sisson testimony). As a result, on April 30, 2019, Sisson filed an Amended Disclosure of Compensation of Attorney for Debtor(s), Form 2030 (the "Amended Disclosure"), which provides as to attorney fees:

| | |
|---|---|
| Debtor agreed to pay (including filing fee) | $3,035.00 |
| Paid to Sisson pre-petition | ( 635.00) |
| Balance Due | $2,400.00 |

(UST Exhibit 6, ¶ 1).

60. The source of the compensation paid, and to be paid, to Sisson was Debtor, and Sisson had not agreed to share his compensation with any other person. (UST Exhibit 6, ¶¶ 2, 3 and 4).

61. The Amended Disclosure further discloses the Pre-Petition Contract and the Post-Petition Contract and their respective terms including the fees paid and payable under each ($300.00 paid under the Pre-Petition Contract, and $2,400.00 to be paid under the Post-Petition Contract, payable in monthly installments up to 12 months post-petition).

(UST Exhibit 6, ¶ 7). The Amended Disclosure clearly provides that the Pre-Petition Agreement was signed prior to the Petition Date, and the Post-Petition Contract was signed after the Petition Date. (UST Ex. 6, ¶ 7).

62. The Amended Disclosure also states: (i) the Fresh Start Line of Credit is a recourse line of credit secured by a collateral assignment of Sisson's accounts receivable, including the amounts owed by Debtor; (ii) Fresh Start provides payment management and processing services and will collect Debtor's payments; and (iii) Debtor consents to the assignment and the sharing of information from Sisson to Fresh Start to facilitate Sisson's financing and the payment management and collection from Debtor. (UST Ex. 6, ¶ 8).

63. Sisson had not noticed, and could not explain why, he changed the Amended Disclosure to state "Debtor agreed to pay" rather than "I have agreed to accept" as in the Initial Disclosure.[11] (UST Ex. 3, p. 12 and Ex. 6).

64. The disclosures made as to Fresh Start and the Line of Credit were based on guidelines provided to Sisson by Fresh Start; he did not personally draft the disclosures. (Sisson testimony). Sisson occasionally gets updated disclosures from Fresh Start. (Sisson testimony).

---

[11]Director's Form 2030 uses the phrase "I have agreed to accept." While Sisson could not explain the clearly intentional change to "Debtor agreed to pay," the Court surmises that the language was changed because Sisson is not accepting $3,035.00 from Debtor, but only $2,100.00 from Debtor; however, Debtor was agreeing to pay $3,035.00 in total ($2,100.00 to Sisson, $335.00 to the Court, and $600.00 to Fresh Start). The Court further surmises that Fresh Start, who provided the forms and disclosures to Sisson, made the change to more accurately reflect what Debtor was paying rather than what Sisson was receiving as they are entirely different. (Sisson testimony).

65. After the garnishment was successfully terminated, Debtor's bankruptcy case proceeded as normal to the Section 341 meeting of creditors and discharge without anything extraordinary taking place. (Sisson testimony).

66. The remaining documentation necessary to obtain Debtor's discharge was filed by Sisson on April 30, 2019, ***14 days after Debtor's initial meeting with Sisson, 13 days after the Petition Date, and well within 30 days of the initial meeting between Debtor and Sisson***. (UST Ex. 4).

67. Sisson agreed that the use of the Pre-Petition and Post-Petition Contracts and Fresh Start Line of Credit was at a cost to Debtor of a compensation premium of at least $900.00 (based on a $1,800.00 pre-petition flat rate). (Sisson testimony).

68. Sisson admitted that Debtor did not understand or appreciate the distinction between Sisson's contractual duties under the Pre-Petition and Post-Petition Contracts and his professional obligations thereunder. (Sisson testimony).

69. There is always a question in Sisson's mind whether consumer clients understand the bankruptcy process as they generally do not have sophisticated legal minds. Per Sisson, it can be challenging to put the process in simple terms, and a lot of questions get answered multiple times. In the end, Sisson often does not know if his clients fully understand what is happening – they just need help and want a lawyer. (Sisson testimony).

70. Sisson does not know if Debtor subjectively understood the conflict discussions surrounding the Pre-Petition and Post-Petition Contracts. (Sisson testimony). In general, based on his experience, most chapter 7 debtors do not have sophisticated legal minds

and the bankruptcy process must be explained in simple terms, and Sisson does not know if they fully understand everything that is happening. (Sisson testimony).

**Sisson's Fee Calculator and Billing Statements**

71. Attached as an Exhibit to his Objection is a "Pre- and Post-Petition Fee Calculator" (the "Fee Calculation") Sisson prepared to assist him in reviewing and updating the cost of his representation in bankruptcy cases to conclusion. (UST Ex. 2). The Fee Calculation uses rates of $300.00 per hour for Sisson, $200.00 per hour for an associate attorney,[12] and $100.00 per hour for his legal assistant and is based on his experience and internal tracking of time spent on cases. (UST Ex. 2).

72. Although it was prepared after Sisson's work in Debtor's case had been concluded and she had received a discharge, the Fee Calculation is not based on what happened in Debtor's case, and, in fact, has little relationship or relevance thereto. (Sisson testimony).

73. Under the Fee Calculation, Sisson estimated pre-petition fees to file a "bare-bones" bankruptcy filing (i.e. bankruptcy petition, social security statement, credit counseling certificate, and creditor list) to be $900.00. (UST Ex. 2).

---

[12]Sisson testified that Matthew Clay Goodin is the associate not identified by name in the Fee Calculation. However, Mr. Goodin is neither a member of Sisson's firm nor an associate thereof (as required by Form 2030), having his own firm "The Goodin Law Firm" in Moore, Oklahoma. Sisson admitted to "sharing" fees with Mr. Goodin but believed him to be either "of counsel" with or an associate of Sisson's firm. ***The Court considers Mr. Goodin to be neither, and directs Sisson to file amended disclosures in all cases where Mr. Goodin received compensation from Sisson and to disclose in all future cases where Sisson may "share" fees with Mr. Goodin.***

74. Under the Fee Calculation, Sisson estimated post-petition fees to file the remaining required documentation and see the bankruptcy case through discharge, and if necessary, reopen a closed case and file amendments, to be $3,100.00. (UST Ex. 2).

75. Consequently, Sisson estimates the actual cost in attorney fees incurred for a bifurcated contract model to be $4,000.00. (UST Ex. 2). Admittedly, not all of the services listed in the "Post-Petition Work" section are always provided in every case, but according to Sisson, he is committing to provide such services in every case, if required. (Sisson testimony).

76. In Debtor's case, most of the "Post-Petition Work" was not required, and thus the Fee Calculation does not accurately reflect the work performed by Sisson on Debtor's case. (Sisson testimony).

77. The Fee Calculation was prepared after the UST questioned Sisson about his contractual relationships with Debtor when Sisson knew that most of the "work" to be done post-petition under the Fee Calculation was not necessary in Debtor's case. (Sisson testimony). Nevertheless, the Fee Calculation was presented as a calculation of what Sisson's fees would have been in the case and contains no disclaimer or caveat that it is not an accurate representation of the services actually rendered by Sisson to Debtor, either pre- or post-petition. (Sisson testimony; UST Ex. 2).

78. The Billing Statements prepared by Sisson were never issued to Debtor but were typical of what Sisson used to help track his time and ensure that the fees he charged his clients were in line with the amount of work performed. (Sisson testimony; Sisson Ex. 4, 5, and 6). Sisson claims he inadvertently failed to include all of his time on the invoices,

and approximated that there should be entries for an additional hour of his time and an additional half hour for his legal assistant. (Sisson testimony).

79. Sisson's testimony and evidence were not credible with respect to (i) the motivation for using Fresh Start, (ii) the costs of the bifurcated contract model and the Fresh Start Line of Credit to his clients, (iii) the alleged amount of extra work required under the bifurcated contract model, or (iv) his "lodestar" calculation of the value of his legal services under a bifurcated contract. Unfortunately, Sisson was the only witness.

**RELEVANT STATUTORY PROVISIONS**

11 U.S.C. § 329 (emphasis added) –

(a) **Any attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation.**

(b) If such compensation exceeds the reasonable value of any such services, the court may cancel any such agreement, or order the return of any such payment, to the extent excessive, to–

(1) the estate, if the property transferred–

(A) would have been property of the estate; or

(B) was to be paid by or on behalf of the debtor under a plan under chapter 11, 12, or 13 of this title; or

(2) the entity that made such payment.

Rule 2016(b), Fed. R. Bankr. P. – **Disclosure of compensation paid or promised to attorney for debtor** – Every attorney for a debtor, whether or not the attorney applies for compensation, shall file and transmit to the United States trustee within 14 days after the order for relief, or at another time as the court may direct, the statement required by § 329 of the Code including whether the attorney has shared or agreed to share the compensation with any other entity. The

statement shall include the particulars of any such sharing or agreement to share by the attorney, but the details of any agreement for the sharing of the compensation with a member or regular associate of the attorney's law firm shall not be required. A supplemental statement shall be filed and transmitted to the United States trustee within 14 days after any payment or agreement not previously disclosed.

Rule 2017(b), Fed. R. Bankr. P. – **Payment or transfer to attorney after order for relief**
On motion by the debtor, the United States trustee, or on the court's own initiative, the court after notice and a hearing may determine whether any payment of money or any transfer of property, or any agreement therefor, by the debtor to an attorney after entry of an order for relief in a case under the Code is excessive, whether the payment or transfer is made or is to be made directly or indirectly, if the payment, transfer, or agreement therefor is for services in any way related to the case.

11 U.S.C. § 526(a) – A debt relief agency shall not–

(1) fail to perform any service that such agency informed an assisted person or prospective assisted person it would provide in connection with a case or proceeding under this title;

(2) make any statement, or counsel or advise any assisted person or prospective assisted person to make a statement in a document filed in a case or proceeding under this title, that is untrue or misleading, or that upon the exercise of reasonable care, should have been known by such agency to be untrue or misleading;

(3) misrepresent to any assisted person or prospective assisted person, directly or indirectly, affirmatively or by material omission, with respect to–

(A) the services that such agency will provide to such person; or
(B) the benefits and risks that may result if such person becomes a debtor in a case under this title; or

(4) advise an assisted person or prospective assisted person to incur more debt in contemplation of such person filing a case under this title or to pay an attorney or bankruptcy petition preparer a fee or charge for services performed as part of preparing for or representing a debtor in a case under this title.

11 U.S.C. § 526(c)(1) – "Any contract for bankruptcy assistance between a debt relief agency and an assisted person that does not comply with the material requirements of this section, section 527, or section 528 shall be void and may not be enforced by any Federal or State court or by any other person, other than such assisted person."

11 U.S.C. §528(a)(1) – A debt relief agency shall–

(1) not later than 5 business days after the first date on which such agency provides any bankruptcy assistance services to an assisted person, but prior to such assisted person's petition under this title being filed, execute a written contract with such assisted person that explains clearly and conspicuously–

(A) the services such agency will provide to such assisted person; and

(B) the fees or charges for such services, and the terms of payment.

## JURISDICTION

This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This matter is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

## LEGAL ANALYSIS AND CONCLUSIONS

The Court is faced with a seemingly simple task – assessing the sufficiency of an attorney's disclosure of his compensation arrangements with a chapter 7 debtor and the reasonableness or excessiveness of that compensation under Sections 329 and 526 to 528 of the Bankruptcy Code. But this statutorily mandated assessment, when juxtaposed with the desperate need of many chapter 7 consumer debtors to obtain advice and assistance of counsel to successfully navigate through bankruptcy, often leads to anguished and tortured interpretation of clear statutory and rule provisions against a backdrop of valid policy arguments and paternalistic concerns. However, this Court's job is limited to interpreting the law and applying it to the facts, leaving the policy decisions to Congress. As the United State Supreme Court has decreed "[i]n the last analysis, these always-fascinating policy discussions are beside the point. The role of this Court is to apply the statute as it is written – even if we think some other approach might "'accor[d] with good policy.'"" Burrage v. United States, 571 U.S. 204, 218, 134 S. Ct. 881,

892, 187 L. Ed. 2d 715 (2014) (citing Commissioner v. Lundy, 516 U.S. 235, 252, 116 S.Ct. 647, 133 L.Ed.2d 611 (1996) (quoting Badaracco v. Commissioner, 464 U.S. 386, 398, 104 S.Ct. 756, 78 L.Ed.2d 549 (1984))). The Court must employ "a fair reading method that dictates the primacy of the statutory text. Stated differently, the inquiry must center on the "'language of the statute itself.'"" In re Escalera Res., Co., 563 B.R. 336, 346 (Bankr. D. Colo. 2017) (citing Ransom v. FIA Card Servs., N.A., 562 U.S. 61, 69, 131 S.Ct. 716, 178 L.Ed.2d 603 (2011) (quoting U.S. v. Ron Pair Enter., Inc., 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)).

## I. BIFURCATED CONTRACTS ARE NOT PROHIBITED BY THE BANKRUPTCY CODE BUT WERE NOT PROPERLY USED BY SISSON.

In Lamie v. United States Trustee, 540 U.S. 526 (2004), the United States Supreme Court held that a chapter 7 debtor's attorney fees could not be treated as an administrative expense, and therefore, could not be paid from estate assets. Lamie, 540 U.S. at 538-39.[13] Additionally, several Circuit Courts of Appeal have held that a pre-petition promise by a debtor to pay attorney fees post-petition is dischargeable in the debtor's chapter 7 case. Rittenhouse v. Eisen, 404 F.3d 395, 396 (6th Cir. 2005); In re Fickling, 361 F.3d 172 (2d Cir. 2004); Bethea v. Adams & Assoc., 352 F.3d 1125 (7th Cir. 2003); and In re Biggar, 110 F.3d 685 (9th Cir. 1997)). The combination of these rulings results in an understandable reluctance on the part of attorneys to represent consumer debtors who cannot compensate them in full prior to filing of the bankruptcy petition.

[13]Specifically, the Supreme Court stated, "[a]dhering to conventional doctrines of statutory interpretation, we hold that § 330(a)(1) does not authorize compensation awards to debtors' attorneys from estate funds, unless they are employed as authorized by § 327. If the attorney is to be paid from estate funds under § 330(a)(1) in a Chapter 7 case, he must be employed by the trustee and approved by the court." 550 U.S. at 538-39.

Not surprisingly, attorneys have pursued a myriad of machinations to get compensated by consumer debtor clients who are often in such dire financial straits that they are without sufficient funds to cover minimal living expenses, let alone pay significant attorney fees up front in order to obtain much needed bankruptcy protection and relief.

Sisson, like most chapter 7 debtors' counsel, seeks to avoid Lamie and the discharge of his fees in this case involving a debtor without the wherewithal to pay up front. Sisson does so by dividing his professional services and the payment of his compensation between two separate contracts, a contract entered into pre-petition for services to be completed and paid for pre-petition and a second contract for services to be completed and paid for post-petition. The bulk of his services under this bifurcated contract model are to be performed by Sisson on a post-petition basis and, accordingly, the majority of the fees are earned and paid on a post-petition basis as well.

Hazlett, 2019 WL 1567751, sets forth a good discussion of the policy issues and the veritable smorgasbord of arrangements utilized by counsel in an effort to be paid for their services in representing relatively impoverished chapter 7 debtors. The Court concurs in Judge Anderson's conclusion that bifurcated attorney contracts are not *per se* improper under the Bankruptcy Code. Hazlett, 2019 WL 1567751, *9.[14] Neither Section 329 nor Bankruptcy Rule 2016 contain any language preventing use of bifurcated contracts between a debtor and counsel,

[14]The Hazlett opinion recognized that the Ninth and Seventh Circuits supported, or at least acquiesced in, bifurcated attorney service agreements for chapter 7 cases to enable cash strapped debtors to retain and pay for counsel to assist them in successfully filing bankruptcy and obtaining a discharge therein. Hazlett, 2019 WL 1567751, *7 (citing Gordon v. Hines (In re Hines), 147 F.3d 1185, 1191 (9th Cir. 1998); Bethea v. Robert J. Adams & Assoc., 352 F.3d 1125, 1128 (7th Cir. 2003)).

provided that one contract is actually entered into pre-petition and the second contract is actually entered into post-petition. In re Griffin, 313 B.R. 757 (Bankr. N.D. Ill. 2004). Parties can potentially enter into a post-petition contract for post-petition services the attorney has not already agreed to perform, creating a new post-petition claim that is not dischargeable. The catch is that "the post-petition contract must really be a post-petition contract. That is, the legally operative events – the offer, acceptance, and exchange of consideration (either a promise to pay or an act of payment in exchange for a promise to render services) – must in fact occur after the date of the Chapter 7 filing to qualify as a claim arising post-petition and falling outside the scope of § 362(a)(6)." Griffin, 313 B.R. at 769-70.[15]

Hazlett sets forth guidelines for when debtors' counsel may employ the use of bifurcated fee agreements in consumer chapter 7 cases. Bifurcated contracts are appropriate where:

1. It is in the best interests of the client;
2. The attorney provides appropriate disclosures, options, and explanations;
3. The client gives informed consent in writing; and
4. The attorney's fee and costs are reasonable and necessary.

---

[15]The Court realizes that purported use of the bifurcated contract model may be nothing more than a subterfuge. Counsel could easily post-date the second contract post-petition even though an agreement is actually reached with, and the contract is actually signed by, the debtor pre-petition. Although such a practice may result in efficiencies, it will not be tolerated. As discussed below, the Court has grave concerns about most debtors' ability to comprehend the legal distinction between the pre-petition contract and the post-petition contract. Thus, the Court will require debtors' counsel to plainly explain, and to actually engage in, the process of executing two contracts separated by the relevant petition date.

Hazlett, 2019 WL 1567751, *10.[16] The alleged bifurcation process used by Sisson in this case does not satisfy the Hazlett considerations.

First, the Court cannot find that it was in Debtor's best interest to agree to pay Sisson $2,400.00 under the Post-Petition Contract (12 monthly payments of $200.00), and $2,700.00 in the aggregate under both contracts. Debtor is a below-poverty level wage earner, with four young children in her care. Her Schedule I reflects monthly net income of $2,061.62, which includes SNAP benefits of $304.00. Her Schedule J reflects monthly expenses of $3,055.86 (including the anticipated $200.00 a month payment to Fresh Start), for a net loss of $994.24 per month (or $794.24 per month without the Fresh Start payment). Debtor simply does not have the means to make the post-petition attorney fee payments. And, while the compelling circumstance of a pending wage garnishment existed in this case, other alternatives were available, which would likely not have resulted in Debtor taking on further debt she clearly could not service.

Second, with respect to the disclosures made by Sisson, they were inadequate and convoluted at best. Third, Sisson and his counsel agreed it was unlikely Debtor fully understood her contractual arrangements with Sisson given her agitation over the garnishment and the

---

[16] This Court declines to review the ethical ramifications of bifurcated attorney contracts in chapter 7 cases. Allegations that counsel has violated the Oklahoma Rules of Professional Responsibility or has otherwise engaged in unethical behavior "have absolutely no place in a pleading filed in this Court. Counsel who are aware of conduct that violates the Oklahoma Rules of Professional Conduct have an ethical duty to report it to the proper authorities, whether it be the Oklahoma Bar Association or the United States Trustee or someone else." In re Gordon, 484 B.R. 825, 831 (Bankr. N.D. Okla. 2013). The bankruptcy court is "not a substitute for these institutions. It is a court, and largely a court of economics at that." Gordon, 484 B.R. at 831.

complexity of the contracts.[17] A conclusion that the disclosures were inadequate necessitates a finding that informed consent is also absent. Fourth and finally, the attorney fees are not reasonable. The inadequacy of Sisson's disclosures and the unreasonableness of his attorney fees are more fully discussed below.

Accordingly, in these circumstances, Sisson's use of the bifurcated agreements does not satisfy the standards set by Hazlett.

## II. SISSON DID NOT SATISFY THE DISCLOSURE REQUIREMENTS UNDER SECTION 329(a) and RULE 2016.

"Disclosure, disclosure, disclosure," should be every debtor's counsel's mantra, whether relating to the debtor's schedules and statement of financial affairs or to the attorney's own disclosures. See, e.g., In re Alcon, 2010 WL 144408, *2 (Bankr. N.D. Cal. 2010). Section 329(a) requires an attorney representing a debtor in a bankruptcy case to file a statement of compensation paid or to be paid if the payment or the agreement to pay was made within one year of filing of the bankruptcy petition. 11 U.S.C. § 329(a). Correspondingly, Federal Rule of Bankruptcy Procedure 2016(b)[18] requires a debtor's attorney "to disclose at the outset all fees paid or agreements regarding fees to be paid, and thereafter they must disclose post-petition transactions within fifteen days." In re Stewart, 583 B.R. 775, 780 (Bankr. W.D. Okla. 2018). "Rule 2017 implements § 329 by directing court review of all bankruptcy-related fees, whether generated pre-or post-petition, whether the payment or transfer is made directly or indirectly, to

---

[17] Had Debtor testified at the hearing, many of the Court's questions and concerns may have been addressed, but she did not, and the Court cannot help but draw an adverse inference from her absence.

[18] Unless otherwise indicated, hereafter all references to rules are to the Federal Rule of Bankruptcy Procedure.

determine whether those fees are excessive." In re Brown, 371 B.R. 486, 497 (Bankr. N.D. Okla. 2007); Fed. R. Bankr. P. 2017.

Disclosure of attorney compensation and agreements for compensation pursuant to Section 329 and Rules 2016 and 2017 is mandatory rather than permissive. Jensen v. United States Trustee (In re Smitty's Truck Stop, Inc.), 210 B.R. 844, 848 (10th Cir. BAP 1997) (citing Turner v. Davis, Gillenwater & Lynch (In re Investment Bankers, Inc.), 4 F.3d 1556, 1565 (10th Cir. 1993)); In re Basham, 208 B.R. 926, 931 (9th Cir. BAP 1997); In re Kowalski, 402 B.R. 843, 848 (Bankr. N.D. Ill.2009) (citing In re Whaley, 282 B.R. 38, 41 (Bankr. M.D. Fla. 2002)); In re Bennett, 133 B.R. 374, 378 (Bankr. N.D. Tex. 1991). "'[D]ebtor's counsel [must] lay bare all its dealings . . . regarding compensation. . . . Counsel's fee revelations must be direct and comprehensive. Coy, or incomplete disclosures . . . are not sufficient.'" Smitty's Truck Stop, 210 B.R. at 848 (quoting Neben & Starrett, Inc. v. Chartwell Fin. Corp. (In re Park–Helena Corp.), 63 F.3d 877, 881 (9th Cir. 1995) (alterations in original) (quoting In re Saturley, 131 B.R. 509, 516-17 (Bankr. D. Me. 1991))).

The Bankruptcy Code requires attorney fee disclosure so that courts can "prevent overreaching by debtors' attorneys and give interested parties the ability to evaluate the reasonableness of the fees paid." In re Hackney, 347 B.R. 432, 442 (Bankr. M.D. Fla. 2006); In re Waldo, 417 B.R. 854, 893 (Bankr. E.D. Tenn. 2009) (citing Jensen v. United States Trustee (In re Smitty's Truck Stop, Inc.), 210 B.R. 844, 848 (10th Cir. BAP 1997)). The attorney compensation disclosure requirements allow bankruptcy courts to scrutinize the compensation paid to a debtor's attorney based on recognition that debtors are in a vulnerable position and are generally "highly dependent" on their counsel and reluctant to object to the fees and payment

arrangements with their counsel. Smitty's Truck Stop, 201 B.R. at 848. "***[P]ayments to a debtor's attorney provide serious potential for evasion of creditor protection provisions of the bankruptcy laws, and serious potential for overreaching by the debtor's attorney, and should be subject to careful scrutiny***." Hackney, 347 B.R. at 442 (quoting H.R. Rep. No. 95-595, at 329 (1977), as reprinted in 1978 U.S.C.C.A.N. 5787, 6285); In re Ortiz, 496 B.R. 144, 148 (Bankr. S.D. N.Y. 2013).

**Sisson's Initial and Amended Disclosures**

Sisson filed the Initial Disclosure when the bankruptcy petition was filed on April 17, 2019, and filed the Amended Disclosure on April 30, 2019, contemporaneously with the filing of Debtor's schedules and statement of financial affairs. (UST Ex. 3, p. 12; UST Ex. 6). The following information provided on the Initial Disclosure remained the same on the Amended Disclosure: (i) the amount of the total fee (including filing fee) to be paid of $3,035.00; (ii) the amount of $635.00 (including the filing fee) having been paid pre-petition; (iii) the balance of $2,400.00 due post-petition; (iv) the source of such compensation was Debtor; and (v) Sisson did not agree to share his compensation with anyone.[19]

The Court identifies two problems with these disclosures that render them inaccurate or at least misleading. First, with respect to the total amount of compensation, the Initial Disclosure states that Sisson "agreed to accept $3035.00," while the Amended Disclosure states "Debtor has agreed to pay $3035.00." When questioned by the Court about the reason for this change in

---

[19]Additionally, both disclosures exclude the following services "Representation of the debtor in any dischargeability actions, judicial lien avoidances, reaffirmation agreements, relief from stay actions or any other adversary proceeding or contested matters." (UST Ex. 3, p. 12; UST Ex. 6).

language, Sisson had no explanation, responding only that Fresh Start had provided him with updated disclosures. As Sisson fails to comprehend the reason for the change, its relative importance, or the impact on the attorney-client relationship, the Court is confident that Debtor, likewise, did not understand the difference in language.

To the Court, the reason for the revision is evident. As originally disclosed, Sisson is representing that he would be accepting $3,035.00. In reality, however, under the bifurcated contract model and the Fresh Start Line of Credit Agreement, Sisson would only be receiving $2,435.00, with Fresh Start receiving the remaining $600.00. Thus, although the Initial Disclosure was consistent with the language in the Pre-Petition Contract and the Post-Petition Contract, it was simply incorrect. While the Court is not suggesting that counsel cannot alter a Director's Form such as Form 2030,[20] it does expect that counsel should be able to explain the reason for any changes, which Sisson could not.

Additionally, the Court also firmly believes that Sisson is sharing the compensation to be paid by Debtor post-petition with Fresh Start. In fact, the $2,400.00 balance due post-petition is never paid directly to Sisson. Instead, Sisson draws 60% of the balance due from the Fresh Start Line of Credit immediately after Fresh Start approves the Debtor's contract, but before Debtor has made any post-petition payments. An additional 15% of the balance due is subject to a holdback provision. Then, about a month post-petition, Fresh Start begins collection of the Sisson receivable directly from Debtor. If Debtor pays the $2,400.00 in full, Sisson will, generally speaking, receive the money subject to holdback under the Line of Credit Agreement. The Initial Disclosure and the Amended Disclosure do not disclose these arrangements. Thus,

[20] In re Jenkins, 2017 WL 7069076 (Bankr. S.D. Ohio 2017); Fed. R. Bankr. Proc. 9009.

although Debtor is aware of the Fresh Start Line of Credit, she has no idea that Fresh Start is entitled to keep $600.00 of the post-petition balance due of $2,400.00.

The Initial Disclosure, filed on the Petition Date, also speaks in past tense regarding Debtor and Sisson having "entered" into the Pre-Petition Contract and the Post-Petition Contract. (UST Ex. 3, p. 12, ¶ 5.d). Upon reading this paragraph, the only rational conclusion is that although Debtor and Sisson entered into one contract to address pre-petition services and another contract to address post-petition services, **both** contracts were executed prior to the petition being filed. When combined with the Fresh Start Consent, which is dated April 17, 2019, the Petition Date, it is virtually impossible to reconcile Sisson's testimony that Debtor actually signed the Post-Petition Contract after the petition was filed, especially given Sisson's testimony that he did not file Debtor's petition until almost 7:00 p.m. on April 17, 2019 (which is corroborated by the docket sheet NEF).

The Amended Disclosure, however, attempts to rewrite history and undo damage already done. It asserts the contracts were executed separately – the Pre-Petition Contract prior to the Petition Date, with $300.00 in fees having already been paid, and the Post-Petition Contract after the Petition Date, with fees of $2,400.00 to be paid. (UST Ex. 6, ¶ 7). Either the Initial Disclosure – or the Amended Disclosure – is correct, but both cannot be. Therefore, one of them is incorrect and misleading. The Court concludes the Initial Disclosure likely best reflects the reality of how the events transpired.

The Initial Disclosure further states that Sisson has a Fresh Start Line of Credit that "allow[s] the Debtor(s) to make payments for up to 12 months post-petition." (UST Ex. 3,

p. 12, ¶ 4). In the Amended Disclosure, it is the Post-Petition Contract, not the Fresh Start Line of Credit, which allows Debtor to pay the $2,400.00 in installments up to 12 months (UST Ex. 6, ¶ 7.b). Consequently, the Initial Disclosure is, once again, plainly incorrect and misleading.

In sum, Sisson's disclosures are confusing and less than complete.[21] As a result, the Court seriously doubts that Debtor fully understood her rights or her obligations and to whom they were owed, or the timing thereof, when she entered into the Pre-Petition Contract and the Post-Petition Contract. Even Sisson's counsel (himself a principal of Fresh Start and apparent mastermind of this line of credit + bifurcated contract model) admitted Debtor likely did not understand such contracts:

THE COURT: And it's difficult for me – I don't know. I – you know, I – I have a hard time, and I went to law school; I have a business background, practiced commercial bankruptcy, wrote contracts, did business workouts for 21 years; I have been a judge for nine and a half, and when I read the pre-petition and the post-petition agreements, I don't think half the debtors that are in my court understand what those say.

MR. GARRISON: You know, Judge, you may be surprised to hear this from me, but I actually agree with that. And I go one step further, and I would suggest to you that in our experience debtors don't understand even the – the terminology and the provisions of a standard engagement agreement or the process or – we could go on and on with that. Right? It's an imperfect system.

[21]Notably, the Initial Disclosure and the Amended Disclosure are lacking in that they do not mention: (i) Sisson may seek to withdraw as counsel if the Post-Petition Contract is not executed by Debtor; or (ii) the fees due under the Post-Petition Contract are not dischargeable.

(Transcript, p. 180, lines 4-17).[22] Certainly, the Initial Disclosure and the Amended Disclosure did nothing to clarify Debtor's rights and obligations, and likely only added to Debtor's confusion and misunderstanding.[23]

To add insult to injury, the Pre-Petition Contract purports to disclose Debtor's other payment option with Sisson, namely that she could pay $335.00 in filing fees and $1,800.00 to Sisson prior to her bankruptcy case being filed. (UST Ex. 8, p. 5,¶ 1). In that context, the contract requires Debtor to expressly acknowledge that not paying the attorney fee pre-petition creates more work and cost for Sisson.[24] (UST Ex. 8, p. 5, ¶ 1). But this disclosure is not made in either the Initial Disclosure or the Amended Disclosure and, on its face, appears inconsistent with Sisson's actual practices. As set forth in the findings of fact above, the amount charged in the bulk of Sisson's chapter 7 cases in 2019 during the months prior to filing of this case was

---

[22]The Court finds Sisson's counsel's proclaimed concern over low income debtors' access to bankruptcy counsel (Transcript, p. 180-82; Closing Argument) dubious at best, given that his company, Fresh Start, receives $600.00 of Debtor's up-charge in this case. For further information on chapter 7 debtors' access to the bankruptcy system, see Final Report of the ABI Commission on Consumer Bankruptcy, III. Facilitating Effective Access to Bankruptcy, A. Paying for Bankruptcy (American Bankruptcy Institute, 2019), available at https://www.nclc.org/images/pdf/bankruptcy/rpt-abi-commission-on-consumer-bankruptcy.pdf. The Commission's recommendations include: (i) changes to the Bankruptcy Code to allow post-petition payments for attorney services rendered pre-petition; (ii) creating easy-to-understand online data input forms to decrease time preparing schedules; (iii) increasing provision of pro bono bankruptcy representation for low-income debtors; (iv) reducing filing fees for low-income debtors, even if represented by paid counsel; and (v) providing low-income debtors legal representation through a governmental office, akin to public defenders' offices.

[23]Again, the actual extent of Debtor's understanding of the bifurcated contract model will never be known as she was not called to testify.

[24]It is difficult to fathom that Debtor could conceptually grasp the work required to file a voluntary petition, schedules, statement of financial affairs, and the like, and also comprehend that her inability to pre-pay for such services would require additional work to be performed by the attorney, much less compute the additional amount or quantity thereof.

$1,835.00 ($1,500.00 attorney compensation and $335.00 filing fee). Based on Sisson's testimony, $1,800.00 is the attorney fee rate given to potential debtors who pay their fees in full over time but pre-petition, and Debtor was not offered the $1,500.00 attorney fee rate because she could not come up with that much money in 30 days, and due to the impending garnishment, did not have the luxury of time. The first problem, therefore, is whether Sisson even let Debtor know about the $1,500.00 rate, which again, based on the Court's review of Sisson's filings from January to April 2019, is his primary rate.

Additional lack of disclosure problems exist, namely that clear comparisons were not set out for Debtor to highlight the differences between what she will pay and what a debtor who can prepay will pay for the exact same services:

| **ONE TIME PREPAY** | **OVERTIME PREPAY** | **PRE- AND POST-PETITION PAY** |
|---|---|---|
| $1,500.00 attorney fees | $1,800.00 attorney fees | $2,700.00 attorney fees |
| $335.00 filing fee | $335.00 filing fee | $335.00 filing fee |

In other words, for the exact same legal services provided, Debtor paid between $900.00 and $1,200.00 more to Sisson and/or Fresh Start solely for the benefit of paying in installments over a year.[25] Simple math reflects the egregious extent of the up-charge imposed on Debtor with inadequate disclosure – an upcharge of either 50% or 80%. Neither the Pre-Petition and Post-Petition Contracts, nor the Initial or Amended Disclosures, make apparent the gross

[25]And, per Sisson, the up-charge is not interest as he does not charge interest. (Sisson testimony). Rather, it is simply an unnecessary cost borne by a debtor to use the bifurcated contract model by way of Sisson's Fresh Start Line of Credit.

discrepancy in treatment between Sisson's clients who can prepay and those like Debtor who cannot, and are then swept into the bifurcated contract/ Fresh Start model.

For these reasons the Initial Disclosure and the Amended Disclosure violate Section 329(a). The appropriate penalty therefor will be discussed in the conclusion section below.

## III. SISSON'S FEES ARE NOT REASONABLE UNDER SECTION 329(b) AND RULE 2017.

"Once a question of the reasonableness of counsel's fees is raised by a party, the attorney bears the burden of proving his fee was reasonable." In re Wood, 408 B.R. 841, 848 (Bankr. D. Kan. 2009) (citing In re Mahendra, 131 F.3d 750, 757 (8th Cir. 1997) (trustee filed a motion for review of attorney fees and motion for sanctions under Rule 9011)). Here, the UST has credibly raised the issue of whether the fees Sisson charged Debtor are reasonable. Further, as reflected in the brief analysis set forth above, the fact that Debtor was charged either 50% or 80% more than Sisson's customary rate, in and of itself, demands a reasonableness review.

Section 329(b) provides that, if an attorney's compensation exceeds the reasonable value of the services, the bankruptcy court may order the return of the excessive payment. 11 U.S.C. § 329(b); Stewart, 600 B.R. 425, 432 (10th Cir. BAP 2019). "Agreed upon compensation of a debtor's attorney may be excessive for a variety of reasons, including the size of the fee, counsel's failure to disclose the compensation as required by Section 329(a), or conduct by the attorney that diminishes the value of the legal services." Wood, 408 B.R. at 848. The factors used to evaluate the reasonableness of the compensation are set forth in Section 330(a)(3) and require a court to "consider the nature, extent, and value of such services, taking into account all relevant factors," including the time spent on the services, rates charged, whether the services

were necessary to the administration of or were beneficial to a case, whether the services were performed in a reasonable amount of time, and the customary compensation of comparably skilled attorneys in other cases. 11 U.S.C. § 330(a); Wood, 408 B.R. at 848; Stewart, 600 B.R. at 431.

If a court determines the attorney fees are excessive, it may cancel the compensation agreement between the attorney and the client, or it may order the return of the excessive portion. Wood, 408 B.R. at 848; Stewart, 600 B.R. at 432; Willoughby v. Peterson, 2016 WL 890755, *3 (Bankr. N.D. Ill. 2016) (citing In re Geraci, 138 F.3d 314, 318 (7th Cir. 1997)). The decision to reduce or disgorge fees pursuant to Section 329 is within the discretion of the bankruptcy court, which must weigh the equities of the case in determining whether the fees are unreasonable or excessive. Stewart, 600 B.R. at 431-32; Willoughby, 2016 WL 890755, *3 (citing In re Wiredyne, Inc., 3 F.3d 1125, 1128 (7th Cir. 1993)).

Examination of Sisson's fees in this case causes the Court great angst for multiple reasons. First, as an attachment to his Objection to the UST's Motion, Sisson provided a lodestar analysis of his fees, the Fee Calculation, which the Court finds to be less than credible.[26] Per Sisson and the Fee Calculation, in the typical bifurcated chapter 7 case, he will incur on average

[26]The Court takes issue with Sisson's lodestar analysis in light of the fact that he routinely excludes services relating to reaffirmation agreements and motions for relief from stay from his representation. Notwithstanding his standard exclusions, the Fee Calculation includes $600.00 in fees for these services. Further, the Fee Calculation contains another $600.00 in fees for reviewing and advising on redemption agreements, which although not specifically excluded from his representation, are exceedingly rare in this Court. Similarly, based on Sisson's own Billing Statements in this case (Sisson Ex. 4, 5, and 6), he incurred only $360.00 in pre-petition fees as opposed to the $900.00 in fees reflected in his Fee Calculation, or a $540.00 difference. As per the Billing Statements, Sisson's total fees billed were $2,079.15 versus the Fee Calculation total amount of $4,000.00, or a difference of $1,920.85. Quite simply, Sisson's lodestar analysis bears no resemblance whatsoever to the realities of his representation of Debtor.

$4,000.00 total in fees. Therefore, in a case like this one, Sisson suggests he will provide $900.00 in pre-petition services, but will be paid only $300.00 in fees resulting in a net loss of $600.00. Similarly, Sisson suggests he will provide post-petition services totaling $3,100.00, but will be paid only $2,400.00 in fees for a net loss of $700.00. Likewise, when comparing his $4,000.00 Fee Calculation figure to his $1,500.00 and $1,800.00 general pre-petition flat fees charged, Sisson would have this Court believe that he ordinarily loses $2,200.00 to $2,500.00 per case. This simply does not make economic sense given that the bulk of the fees identified will be the same whether a debtor pre-pays or pays over time and will require Sisson to prepare the same documentation in either instance.

Specifically, a review of the Fee Calculation time entries reveals that all but 0.8 hours of the 14.5 hours incurred post-petition are the same services performed for a debtor whether one pre-petition contract or the bifurcated contract model is used. Other than the 0.8 hours for conducting a second signing appointment to review and sign statements and schedules, the Court is not convinced it would take any more time to perform those same tasks just because there are two contracts and the work is being performed post-petition rather than pre-petition.[27] The Fee Calculation provided by Sisson simply does not reflect the economic reality he faces in representing chapter 7 debtors or he, too, would eventually be a chapter 7 debtor.

At the hearing, Sisson also presented his Billing Statements (Sisson Ex. 4, 5 and 6) as evidence of the reasonableness of his compensation. With respect to Debtor's case, the Billing

---

[27]The Court's sample review of Sisson's cases reveals that all of his $1,800.00 flat rate cases from January 1, 2019, to April 30, 2019, were complete when filed rather than bare bones filings, while 7.7% of the $1,500.00 flat rate cases (which Sisson claimed were only offered to those clients who can pre-pay and provide all of the documentation within 30 days) were "bare bones" filings and completed only post-petition.

Statements reflect payment of expenses and time spent by Sisson and his assistant between April 16, 2019 and July 24, 2019, that would generate total fees and expenses in the amount of $2,079.15. Sisson testified that such time was not accurate as he failed to record all of his time but had not bothered to quantify or document such time or correct the Billing Statements prior to their use at the October hearing. For this reason alone, the Court finds the Billing Statements to be less than credible on the issue of Sisson's time.[28]

As for the customary rate in the area, Sisson testified that the average flat fee rate for chapter 7 debtor's counsel is $1,200.00 to $1,400.00 per case. Upon completion of her installment payments, Debtor will have paid a total of $2,700.00 in attorney fees (although Fresh Start will have received $600.00 thereof). So, Debtor, who supports four children and whose income is below the poverty level, paid Sisson $1,300.00 to $1,500.00 more than the average local rate for chapter 7 cases for the right to make post-petition payments for essentially the same services. Similarly, Sisson himself ordinarily charges $1,500.00 to $1,800.00 for his chapter 7 representation, so Debtor paid $900.00 to $1,200.00 more to Sisson than his customary rates for the right to make post-petition payments. This up-charge is absurd.

The justification provided by Sisson for the increased fees was additional work required by the bifurcated contract process and not receiving all of the necessary documentation pre-petition. But, at most, this would amount to another meeting to have the Post-Petition Contract signed, generating perhaps an additional fee of $300.00 for an hour of his time, over the

---

[28]It makes no sense that Sisson would take the time to generate the Billing Statements for use as trial exhibits notwithstanding that he knew them to be inaccurate. They were never sent to Debtor so the Court is at a loss as to why he would not have corrected them prior to identifying and using them as exhibits.

customary $1,500.00 or $1,800.00 rates. All of the other underlying bankruptcy work would be the same whether a debtor initially paid the entire fee and provided all necessary documentation pre-petition ($1,500.00), paid the fee and provided the documentation over time but pre-petition ($1,800.00), or paid $300.00 pre-petition and $2,400.00 post-petition in installments and provided the bulk of the documentation post-petition because the same schedules, statement of financial affairs, statement of intent, etc. are prepared regardless of such timing.

As much as the Court cringes at the thought of finding attorneys fees to be unreasonable, in this instance, the Court has no choice. The numbers do not lie. Sisson charged Debtor 80% more than clients he charges $1,500.00 because Debtor could not provide the necessary documentation and pay the fee up-front within 30 days even though Debtor provided the necessary documentation to Sisson well within 30 days. Sisson charged Debtor 50% more than clients he charges $1,800.00 simply because Debtor could not pay the fees up-front pre-petition. Sisson failed to present any compelling evidence justifying this excessive up-charge solely so that Debtor could pay the fees in installments over a year.

The ramifications of the unreasonableness of Sisson's attorney fees will be discussed in the conclusion section below.

## IV. THE PRE-PETITION CONTRACT AND THE POST-PETITION CONTRACT DO NOT MATERIALLY COMPLY WITH SECTION 528 AND ARE, THEREFORE, VOID.

Sisson, as an attorney providing legal services to consumer debtors, is a debt relief agency subject to the provisions of Sections 526 - 528. Milavetz, Gallop & Milavetz, P.A. v. U.S. , 559 U.S. 229, 239 (2010); In re Wright, 591 B.R. 68, 97 (Bankr. N.D. Okla. 2018). "The purpose of incorporating the provisions in 11 U.S.C. §§ 526 - 528 was to require debt relief

agencies to disclose specific information about the bankruptcy process to consumer debtors, whose frequent ignorance and confusion could subject them to easy deception." In re Rodriguez Perez, 2018 WL 3655656, *6 (Bankr. D. P.R. 2018) (citing Conn. Bar Ass'n v. United States, 620 F.3d 81, 95 (2d Cir. 2010). Sections 526, 527, and 528 govern the relationship between "debt relief agencies" and "assisted persons" – in this instance, Sisson and Debtor – by regulating the mechanisms and procedures used to provide bankruptcy services to consumer debtors. Rodriguez Perez, 2018 WL 3655656, *6 (citing Hersh v. United States, 553 F.3d 743, 747 (5th Cir. 2008)).

Section 528 specifically governs the required written contract between the consumer debtor and the attorney. It provides that a written contract between the debtor and its counsel must be executed not later than five business days after bankruptcy assistance was first provided to the debtor and before the petition is filed. The contract must clearly and conspicuously explain the services that will be provided to the debtor, the fees and costs for such services, and the terms of payment. Rodriguez Perez, 2018 WL 3655656, *7 (citing 11 U.S.C. § 528(a)); In re Jackson, 2014 WL 3722019, *3 (Bankr. W.D. La. 2014); In re Davis, 605 B.R. 658, 666 (Bankr. D. N.J. 2019) (the contract requirements of Section 528 must be completed within five days of the first date on which bankruptcy assistance services were provided to the debtor and prior to the filing of the bankruptcy petition).

Section 526(c) provides the liability to which an attorney may be exposed as well as the enforcement mechanism to compel compliance with the debt relief agency requirements and restrictions. Rodriguez Perez, 2018 WL 3655656, *8. Under Section 526(c)(1), if a contract between counsel and the debtor does not comply with the material requirements of Sections

526 - 528, it is void and cannot be enforced by anyone other than the assisted person. 11 U.S.C. § 526(c)(1). Section 526(c)(2) makes an attorney who acted intentionally or negligently in failing to comply with Section 526, 527 and 528 liable for fees already received, actual damages, and reasonable attorneys' fees. 11 U.S.C. § 526(c)(2).

**Application of Section 528(a)**

"The high standard of § 528(a) has been interpreted as encompassing the duty to explain with clarity in the written contract the services to be provided and the fees or charges for such services." Rodriguez Perez, 2018 WL 3655656, *10. To illustrate such duty, the Rodriguez Perez bankruptcy court relied on an Eastern Virginia bankruptcy court's analysis:

> In this case, the law firm provided the debtor a written contract at the time of the first office conference. However, the agreement, although comprehensive and detailed, could hardly be characterized as clear. In terms of formatting, it consists of a single, visually-dense, small-type, 902-word paragraph covering a number of issues which are not addressed in any organized or logical manner. It is true that a careful reader, upon reading the entire document, would probably come to understand that the $3,000 fee so prominently set forth at the top of the document is effectively a minimum fee for the case. But it is doubtful that a consumer debtor who has never been through the bankruptcy process and is not a sophisticated purchaser of legal services would have any real understanding, even after reading the contract, just how much actually is covered by the retainer. Put another way, since a consumer debtor does not know what services are likely to be needed, such a consumer would have no way of knowing whether the stated exclusions are likely to apply, and what the chances are of receiving a bill that (as here) vastly exceeds the retainer.
>
> . . .
>
> Clearly, competing interests are at stake. Good attorneys should be fairly compensated for work that benefits the client–otherwise they will not remain in business for long. At the same time, clients are entitled to a clear statement of the fee arrangement and the services

> to be provided. The attorney is the one who is knowledgeable about legal fees and the services likely to be required; the client typically is not. "Plain English" contracts may not be easy to draft, but Congress obviously expected attorneys representing consumer debtors in bankruptcy to provide as much clarity as possible. § 528(a)(1), Bankruptcy Code[.]

Rodriguez Perez, 2018 WL 3655656, *10 (quoting In re Robinson, 368 B.R. 492, 501-02, (Bankr. E.D. Va. 2007)). "Clear and conspicuous" provisions regarding services and fees are the key components of compliance with Section 528(a). Rodriguez Perez, 2018 WL 3655656, *10-11 (citing In re Lugo Parrilla, 530 B.R. 1, 14 (Bankr. D. P.R. 2015)); Jackson, 2014 WL 3722019, *3.

Here, both the Pre-Petition Contract and the Post-Petition Contract were entered into within the five day limitation of Section 528(a)(1). But that is where Sisson's compliance with Section 528(a) ceases. The Pre-Petition and Post-Petition Contracts are anything but models of clarity, and fall far short of the required clear and conspicuous explanation of services to be provided, fees to be charged, and terms of payment.

The Pre-Petition Contract is a 4 ½ page single-spaced document (notably all pages are numbered "5") with 10 numbered paragraphs, signed by both Debtor and Sisson on April 17, 2019. (UST Ex. 8). The Post-Petition Contract is similar – a 3 ½ page single-spaced document with 6 numbered paragraphs, allegedly signed by both Debtor and Sisson on April 18, 2019. (UST Ex. 9). While they both contain disclosures and purported explanations of the payment and filing options, and the legal services to be provided, the Pre-Petition and Post-Petition Contracts are perplexing. Specifically,

- The Pre-Petition Contract, p. 2, ¶ 4(a) provides that the post-petition fee of $2,400.00 "will be paid in weekly or bi-weekly, or monthly, or semi-monthly installments of totally $200.00 per month until paid in full[.]" (UST Ex. 8).
- The Post-Petition Contract, p. 2, ¶ 1 provides the post-petition fees of $2,400.00 are to be paid "in monthly installments of $200.00/month for 12 months, which will be paid monthly, or semi-monthly, or weekly, or bi-weekly (depending upon my pay period) until paid in full[.]" (UST Ex. 9).

The Court finds the disclosure of the compensation terms set forth above extremely confusing. Additionally, key components of the payment terms are noticeably missing, i.e. when does Debtor begin making the installment payments and to whom are they to be made.[29] Couple this enigmatic language with a Debtor who was hysterical when she arrived in Sisson's office on April 17, 2019, and this Court seriously doubts Debtor fully understood her obligations and the terms of payment.[30]

Additionally, both contracts contain what can only be described as "legalese" not easily understood by a layperson such as Debtor, which is inconsistent with the requirements of Section 528(a). In re Seare, 515 B.R. 599, 614 (9th Cir. BAP 2014). The legalese includes a discussion of the "bifurcated" case, a disclosure that neither contract covers adversary proceedings or

---

[29]Debtor is required to look to the Consent, UST Ex. 10, to determine when her payments commence and on what day of the month they are to take place. Notably, the Consent Form is not a contract signed by Sisson as required by Section 528(a)(1). Jackson, 2014 WL 3722019, *3.

[30]It bears mentioning again that Debtor was not called as a witness; her testimony could have gone a long way in determining her comprehension and understanding of the Pre-Petition Contract and the Post-Petition Contract.

contested matters, discussions of Sisson's Fresh Start Line of Credit and its impact on Debtor's obligations to Sisson and the possibility of conflicts of interests between Debtor and Sisson. Additionally, notwithstanding the creation of an attorney-client relationship, the confusing legalese includes an express disclaimer of any legal representation with respect to the Pre-Petition Contract or the Post-Petition Contract combined with a recommendation that Debtor seek independent legal counsel to review the contracts.[31] Per Sisson, it is unlikely that Debtor understood what she was agreeing to or the terms of his engagement and, on April 17, 2019, probably did not care as she was single-mindedly focused on obtaining the protection of the automatic stay. A "plain English contract" was required but certainly not provided by Sisson. Sisson's counsel, himself a principal of Fresh Start who provided the form contracts to Sisson, admitted the contracts lacked clarity, resulting in the failure of most consumer debtors to understand them.

Finally, the Court finds fault with the disclosure of Debtor's options under the Pre-Petition Contract with respect to the amount of fees Sisson would be entitled to thereunder. Specifically, Sisson should have spelled out in a more simplistic, clear, and concise manner all of the fee options available to Debtor, such as set forth on page 31 supra. Debtor was entitled to fully understand the incremental cost in her attorney fees if she selected the bifurcated contract model. The Court also has concerns that the disclosures inadequately represent the impact of the Fresh Start Line of Credit, namely that Fresh Start, not Sisson, will receive $600.00 of the $900.00 to $1,200.00 up-charge.

---

[31]Such recommendation is disingenuous at best given Sisson's knowledge that Debtor could not afford to pay him up-front.

The Pre-Petition Contract and the Post-Petition Contract do not comply with the material requirements of Section 528(a) and are, therefore, void pursuant to Section 526(c)(1).

**CONCLUSION**

For the reasons set forth above,

1. The Pre-Petition Contract and the Post-Petition Contract are void.
2. As Debtor had a satisfactory outcome in her bankruptcy case, the Court will not order Sisson to disgorge any attorney fees paid by Debtor to the date of this Order.[32]
3. However, Debtor is directed to make one final payment to Sisson (not to Fresh Start) of $200.00 on or before December 20, 2019. Thereafter, no further attorney fee payments are due from Debtor to either Sisson or Fresh Start.
4. Sisson and Fresh Start are directed to have no further contact or communication with Debtor regarding the payment of legal fees.

IT IS SO ORDERED.

# # #

[32]The Court does not take issue with the actual legal services provided to Debtor by Sisson, which appear to have been reasonable and necessary and resulted in a satisfactory result for Debtor. The Court's sole concern is the mechanism he selected for payment of his attorney fees. Such mechanism, with insufficient disclosures and confusing contracts, resulted in a significant up-charge in the form of post-petition debt being incurred by a financially challenged, distressed, and unsophisticated debtor.